

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

ALB:JAM
F.# 2015R01243

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

November 17, 2016

<u>By ECF and Hand Delivery</u>

The Honorable Arthur D. Spatt
United States District Judge
Eastern District of New York
100 Federal Plaza
Central Islip, New York 11722

   Re: United States v. John Petiton
     <u>Criminal Docket No. 14-221 (ADS)</u>

Dear Judge Spatt:

   The government respectfully submits this letter in advance of sentencing in the above-captioned case, which is scheduled for December 2, 2016.  The government also has enclosed a DVD containing the full transcript of co-defendant Aaron Wider's trial, as well as numerous trial exhibits, which are cited and referenced in this submission.

   For the reasons set forth below, the government recommends that a sentence within the advisory United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") range of 63 to 78 months be imposed.  As per the plea agreement entered into by the parties - in which the defendant stipulated to the Guidelines calculation contained herein - the government takes no position on where within the applicable Guidelines range the appropriate sentence should fall.

<u>Factual Background</u>

I. <u>Overview of the Scheme</u>

   The defendant has pled guilty to participating in a massive bank and mortgage fraud conspiracy.  Acting in concert with co-defendant Aaron Wider, the defendant facilitated the issuance of millions of dollars in fraudulent mortgages through Wider's mortgage bank, HTFC Corporation.  <u>See</u> Pre-Sentence Investigation Report ("PSR") at ¶¶ 1-15.

Neither Wider nor HTFC possessed any significant assets to originate loans. See PSR at ¶¶ 9-14. Rather, Wider and his bank relied on a line of credit with large institutions, commonly called "Warehouse Lenders," to provide the funding for mortgages that would be issued by HTFC. Id. As such, a mortgage bank like HTFC would normally review the loan applications of prospective borrowers, ascertain their creditworthiness, and insure that the property being purchased was of sufficient market value to collateralize a mortgage. Id. That information would then be forwarded by the mortgage bank to the Warehouse Lenders to obtain funding for specific mortgages. Id. Upon getting funding and issuing the mortgage, HTFC could service the loan or sell it to investors in the secondary mortgage market. In this case, Wider sold every one of HTFC's mortgages to other financial institutions in the secondary mortgage market. Id. As so-called "stated" income and asset loans, HTFC's mortgages bore relatively high interest rates (approximately 7% to 10%), and yet were seemingly safe investment options because the loans were represented by HTFC and Wider to be fully collateralized by the real property, as well as the incomes and assets of the purchasers. Id. Upon buying a mortgage, the secondary market institution paid off the Warehouse Lender, and then either serviced the loans themselves, or bundled the notes with others into collateralized mortgage obligations or mortgage-backed securities that would be re-sold to other investors such as hedge funds, pension funds, or other investment vehicles. Id at ¶ 14.

Wider also recruited others to act as straw buyers to get funding for home purchases through HTFC mortgages. Id at ¶¶ 12-15. The conspirators, including Petiton, repeatedly lied about their incomes, manufactured the balances in bank accounts and other assets they claimed to own, concealed their liabilities (including judgments against them in prior civil litigation), and forged signatures and documents on HTFC loan applications. Id at ¶¶ 8-21. Those applications were then forwarded to the Warehouse Lenders. Id at ¶¶ 9, 22.

Wider, Petiton, and the coconspirators then engineered a series of sham transactions on the day they closed on home purchases from innocent third party sellers. See PSR at ¶¶ 8-19. The purpose of the sham transactions was to artificially-inflate the purported home prices and the supposed market value of the collateral in order to borrow sums of money that were sometimes over 100% more than the purchase price of the homes. Id. Co-defendants John Petiton and Eric Finger, both attorneys admitted to practice law in New York, as well as Joseph Mirando, a New York licensed real estate appraiser, created phony contracts, closing settlement statements, trust agreements and appraisal reports to obtain funding from the Warehouse Lenders for amounts that far exceeded the collateral value of the homes. Id. As proven at co-defendant Wider's trial, these complex, same-day sham transactions became known as "Aaron Specials" by those privy to them. PSR at ¶ 10; see also Trial Tr. at 860:21-861:4 (Testimony of Marie Simmons).

The following summarizes one "Aaron Special" pertaining to 126 Spring Street, Massapequa, New York on February 24, 2006 (See GX 2503, 2502, 4511, 4534):

- At the direction of Wider, the straw purchaser contracted to buy the home from an innocent third-party seller at the negotiated price of $420,000.

- The straw purchaser completed an HTFC loan application requesting funding for a mortgage to buy the same home at the inflated price of $795,000. Wider falsified the statement of assets and income, and the application was forwarded to the Warehouse Lenders.

- At the direction of Wider, real estate appraiser Joseph Mirando prepared an appraisal justifying the $795,000 mortgage request by, among other things, misstating the true sales price and using higher-priced sales as "comparables." In one instance, to justify an inflated purchase price, Mirando favorably compared a dilapidated house located on a truck route adjacent a gas station to a waterfront home with a private boat dock.

- Based on the false HTFC loan application, the Warehouse Lenders approved funding for 80% of the inflated sales price, that is, approximately $636,000.

- At closing, attorney John Petiton oversaw the straw buyer's purchase from the innocent seller at the price of $420,000, and then immediately executed a trust agreement, deed transfer and other documentation to create a false paper trail documenting the inflated transaction of $795,000.

- Simultaneously, HTFC settlement attorney, Eric Finger, who received $795,000 in wire transfers from the Warehouse Lenders, prepared a settlement statement, known as a HUD-1, in which he concealed the lower, true sales price, and fabricated a down payment that the straw purchaser supposedly made towards the $795,000 fraudulent transaction. In fact, no down payment towards any home purchase was ever made on any of these sham transactions.

- Finger then paid the innocent seller $420,000 for the home, and dispersed the remaining in surplus funding to Wider and the coconspirators, less fees to other parties and small amounts that were used to make a few monthly payments - creating the illusion of a solvent buyer and sound investment - until HTFC could re-sell the mortgage to secondary market investors.

- Using the fraudulent loan application, appraisal report, HUD-1 and other documentation, Wider sold the loan to the secondary mortgage market, falsely representing the mortgage as "investment-grade." Wider and his coconspirators intentionally delayed recoding the falsified title documents, further disguising the scheme from investors and subsequent home purchasers.

- Every mortgage issued through HTFC in this manner defaulted and went into foreclosure.

When HTFC's mortgages went into foreclosure beginning in 2007 and 2008, investors on the secondary market discovered that the actual value of the collateral backing the mortgages was often 80-100% less than the amount that had been borrowed for each property. See PSR at ¶¶ 15-21.

As proven at co-defendant Wider's trial, the defendant and his coconspirators are known to have purchased over 50 individual properties as part of the scheme. However, the defendant often structured multiple fraudulent transactions for any given property. For instance, between May 2004 and April 2005, there were three separate fraudulent mortgages

issued for 14 Carmen Boulevard in Massapequa, New York, which generated almost $2 million in stolen mortgage proceeds. See GX 4556, 3507. To illustrate:

- On May 25, 2004, Aaron Wider purchased the property from an innocent third-party seller for $320,000. That same day, Wider deeded the property to a sham trust created by John Petiton for no consideration. Immediately thereafter, Wider re-purchased the property for $550,000, taking out a $440,000 mortgage through HTFC.
- On December 21, 2004, Aaron Wider deeded the property to GCF Development Corp - an entity wholly owned and controlled by Wider - for no consideration. On the same day, GCF Development Corp sold the property to John Petiton for $800,000. Petiton took out a $600,000 mortgage on the sham purchase, which was processed through HTFC.
- On April 28, 2005, John Petition transferred the property to an entity he created, the Petition Family Trust, for no consideration. That same day, the property was sold to a straw purchaser for $805,000. Two mortgages totaling $744,000 were processed by HTFC.

Thus, in less than one year, Wider and Petiton were able to generate $1.78 million in mortgage proceeds using multiple sales of the same property pursuant to the same scheme. As in the above transactions, Petiton acted not only as the creator and executor of the sham trusts, but also as the straw purchaser and borrower.

II.     The Defendant's Role

As an attorney licensed to practice in New York state, the defendant played several pivotal roles during the course of the fraud. Indeed, the defendant had an office in "Mr. Wider's suite" that was "immediately next door to Mr. Wider's office [with his] name on the door." Tr. at 470:3-7 (Testimony of Ellen Petruzzelli-Davis), 612:15-18 (Testimony of Majeet Bawa), 886:14-19 (Testimony of Yograine Bharrat). This led most HTFC employees to conclude that the defendant was HTFC's "in house attorney." Id.

Eric Finger, one of the coconspirators, was introduced to the defendant by Wider during the planning phase of the scheme. Tr. at 240:18-243:21 (Testimony of Eric Finger). Finger was advised that "he [Petiton] had done transactions similar to this using a trust, and he was going to prepare the trust prior to the actual date of the closing, obtain what's called a tax identification number for the trust for the IRS, and he would actually sign any documents necessary to be signed on behalf of the trust." Id. As testified to by several witnesses at trial, Petiton effectively acted as Wider's attorney and HTFC's general counsel during the course of the scheme. PSR at ¶ 36

After preparing the requisite documents to create the sham trusts - including bank accounts that the illicit proceeds were moved through - Petiton played two key roles during the fraudulent closings. As described by Finger:

> "Mr. Petiton had two roles during this transaction. He acted as the trustee/seller in the fake sale, the higher priced sale. He also acted as the buyer's attorney [the straw buyer] on the true sale, so he would actually go from one room to the other. He would go upstairs signing he transfer documents on the fake sale, and then he would go downstairs and speak to the attorney for the true seller. . . to find out how they wanted the [purchase price] paid out."

Tr. at 248:9-19 (Testimony of Eric Finger). To facilitate the creation of the fake trusts for the properties "[Petiton] was essentially the seller - the agent for the seller that was the trust. He had to sign the deed transferring it to the trust… so he was really the seller's agent or representative". Tr. at 249:2-5 (Testimony of Eric Finger). As compensation, the defendant "received $2500 per transaction." Tr. at 249:8 (Testimony of Eric Finger).

On several occasions, the defendant himself acted as the straw purchaser, in addition to his usual roles. PSR at ¶ 14. As proven at trial, one of HTFC's warehouse lenders, First Collateral Services, issued $3.4 million in loan proceeds on five separate transactions where the defendant was listed as the buyer. See GX 4100, Tr. at 939:3-8 (Testimony of Kumiko Nguyen).

As proven at Wider's trial, Petiton also helped obscure the existence of the fraud by failing to record deeds in a timely fashion, doing so months and sometimes years after the sham sales. By doing so, a title search by a third party would not uncover the fraudulent transaction. This was critical in allowing the subject properties to be resold and the mortgages to be purchased by secondary market investors. When he did eventually record a deed, Petiton would routinely file related false documents with Nassau and Suffolk Counties, most notably the RP-5217 form. See GX 5400-5410. As described at trial, this form "requires more information that's available on the deed," including whether or not the transaction was at arms-length or between related parties. Tr. at 122:11-126:16 (Testimony of Eileen Ryan). Indeed, the defendant's name was one of three that showed up "most often" on the suspect RP-5217 forms, which incorrectly stated that the sham transactions from the sham trusts to the straw buyers were arms-length transactions. Id. at 127:3-5, GX 5400-5410.

The defendant also used his influence and office in HTFC to silence the concerns of those who had become suspicious of Wider's practices. After Ellen Petruzzelli-Davis, a former employee of HTFC corporation, began to question the dealings of her supervisors, the defendant told her that "if [she] continued to be a fly in the ointment, that [her] employment contract would be terminated." Tr. at 470:16-18 (Testimony of Ellen Petruzzelli-Davis).

Additionally, as lenders, investors, and duped home buyers attempted to recoup their losses from Wider's fraudulent conduct, dozens of civil actions in various jurisdictions were initiated against Wider and HTFC. The defendant was frequently called as a witness and deposed in such proceedings, during which he was routinely evasive, obstructionist, and at times perjurious, all to prevent the discovery of his criminal behavior

and allowing the scheme to continue.  See generally, GMAC vs. HTFC Corporation, 06-CV-5291 (E.D.Pa.), Deposition of John Petition; Aurora Loan Services LLC v. Wider et al,11-CV-06111(LDW)(GRB), Deposition of John Petiton.  For example, when deposed by GMAC, the defendant claimed to not know what GCF Development Corp is; who the owners or beneficial interest holders are; disavowed any knowledge the purpose of the sham trusts; and even claimed to have no knowledge of the origin and purpose of the Petiton Family Trust, which was used in the fraud involving 14 Carmen Boulevard, described above.  See GMAC vs. HTFC Corporation, Deposition of John Petition, at 53:2-56-8; 67:2-80:3.  In Aurora Loan Services LLC v. Wider et al., Petiton was not only deposed, but even acted as the attorney for Wider and a sham entity, the Wider Family Trust, in a lawsuit before the Honorable Leonard D. Wexler, U.S. District Judge for the Eastern District of New York, where Wider attempted to hide assets in sham trusts and submitted forged documents to the court.  See Aurora Loan Services LLC v. Wider et al,11-CV-06111(LDW)(GRB)

## Guidelines Calculation

The government agrees with the Probation Department that the 2007 Guidelines Manual is applicable in calculating the defendant's Guidelines range.  See U.S.S.G. § 1B1.11(a).  The government submits that the Guidelines calculation set forth below and in the October 23, 2015 plea agreement should be applied.  In paragraph two of the plea agreement, the defendant stipulated to these calculations.

| | |
|---|---|
| Base Offense Level (§§ 2X1.1, 2B1.1(a)(1)) | 7 |
| Plus: Loss exceeds $2,500,000 (§ 2B1.1(b)(1)(J)) | +18 |
| Plus: Sophisticated Means (§ 2B1.1(b)(9)(C)) or Abuse of Private Trust (§ 3B1.3)) | +2 |
| Plus: Gross Receipts of Over $1 Million From Financial Institutions (§ 2B1.1(b)(13)(A)) | +2 |
| **Total Offense Level:** | **29** |

Given the defendant's acceptance of responsibility and timely guilty plea, a three-level reduction is warranted pursuant to U.S.S.G. §§ 3E1.1(a) and (b).  The total adjusted offense level is 26, which, based on a Criminal History Category of I, carries a Guidelines range of 63 to 78 months in custody.

While the defendant stipulated to the above Guidelines calculation, the government notes that the enhancements outlined above are properly applied.

A two-point increase in the offense level is justified when the offense involved "sophisticated means," defined as involving "complex and intricate" methods.  U.S.S.G. § 2B1.1(b)(10)(C).  As described above, the defendant played a pivotal role in an extremely

complex fraud, requiring a tremendous amount of planning; multiple individuals with special skills in law, banking, real estate, and accounting; and the preparation of hundreds of thousands of falsified and forged documents. Indeed, the use of trust entities and their corresponding bank accounts - which operated in a manner similar to "nominee accounts" and "corporate shells" in the sham transactions - would, standing alone, justify a two-level increase. U.S.S.G. §2B1.1 comment. n. 9(B) (listing "corporate shells" as an example of sophisticated means).

This enhancement would also be appropriate under the theory that the defendant abused a position of "private trust" in a manner that significantly facilitated the commission of the fraud. U.S.S.G. § 3B1.3. "Private trust" refers to a position "characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference). Id. The Guidelines note that "[p]ersons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature." As noted in the Addendum to the PSR, Petiton's role as an attorney and his "ethical and fiduciary duty to enter into honest transactions, most certainly was relied upon by his clients, the property buyers, the sellers, the bankers, and the public registrants." Addendum to PSR at 3.

The defendant does not contest the loss amount listed above, but incorrectly attributes 16 points, rather than 18 points, to this enhancement. See Def. Mem. ¶ 61, § 2B1.1(b)(1)(J)).

A two-point enhancement in the offense level is appropriate when the defendant derived more than $1 million in gross receipts from one or more financial institutions. U.S.S.G. § 2B1.1(b)(16)(A). As detailed in the PSR and as evidenced above, the defendant conspired to source millions in gross receipts from numerous financial institutions. Therefore, an additional two points is proper.

Thus, as calculated above, and as stipulated to by the defendant and the government in the plea agreement, the total adjusted offense level is 26, which, based on a Criminal History Category of I, carries a Guidelines range of 63 to 78 months in custody.

III. Argument

In this case, a Guidelines sentence is warranted because of, among other things, (1) the seriousness of the defendant's conduct, (2) the defendant's repeated disregard for the law, and (3) the need for specific and general deterrence. See 18 U.S.C. § 3553(a)(1), (a)(2)(A)-(C).

A. Seriousness of the Offense

As proven at trial, and as described in the PSR and above, the defendant was integral to the planning, execution, and cover-up of the scheme. The Guidelines do not

accurately quantify the scope and impact of the fraud and the defendant's conduct, whose reverberations will continue well into the future.

Beyond the financial institutions that were damaged by the fraud, his behavior has had an incalculable effect on the residents and housing market in the Eastern District of New York and beyond. This impact should not be ignored when considering the defendant's sentence. See United States v. Karro, 257 F.3d 112, 121 (2d Cir. 2001) (discussing how even "the risk of non-monetary harms…[are] a permissible basis for an upward departure" from the sentencing guidelines). Such inherent effects to mortgage fraud crimes were explicitly detailed in United States v. Hill, 643 F.3d 807 (11th Cir. 2011). In Hill, the district court noted that the amount of loss was not fully taken into account in calculating the Guidelines range, as mortgage fraud was serious crime and banks that lost money were not the only victims. Id. The court noted that mortgage fraud affected innocent individuals who lived next to foreclosed properties, and that many unwitting straw buyers had their credit ruined and were forced to declare bankruptcy. Id.

Similar consequences have been the natural and probable outcome of the defendant's conduct in this case. Indeed, it has been estimated that "Zombie homes," like those created by the defendant's conduct, have cost Long Island "at least $295 million in depreciated home values," according to a real estate appraiser's analysis. See "Zombie Houses: A Newsday and News 12 Special Report," available at http://data.newsday.com/projects/long-island/zombie-houses/. Similarly, many of the toxic mortgages were securitized and ended up in pension funds and other investment vehicles, causing an unknowable number of individuals to feel the effect of the scheme. The scheme even ruined the lives and credit of other coconspirators, specifically the straw buyers, as demonstrated by the trial testimony of Alex Christie and Manjeet Bawa.

Innocent homebuyers were also duped. A November 2007 Newsday exposé on the scheme chronicled the stories of families who suffered at the expense of the fraud. See Randi F. Marshall, Banker's Alleged Tactics Exposed, Newsday, Nov. 18, 2007, at A22. These homebuyers were manipulated and misled into purchasing overvalued properties whose values had been inflated through the defendant's scheme.

For example, Robin and William Fitzgerald, who collectively earned approximately $100,000 annually, utilized HTFC as their mortgage bank in 2005 to purchase a home in North Massapequa for $805,000. Id at A23. Wider told the Fitzgerald's that because he was a mortgage banker, he could approve a loan that other banks wouldn't, and allow them to realize their dream of being homeowners. Katie Thomas, Too Good to be True?, Newsday, Nov. 18, 2007, at A28. HTFC fraudulently overstated their annual income on the loan application, and the Fitzgeralds predictably struggled to make mortgage payments. Marshall at A23. Approximately one year after purchasing the home, GMAC bank, who had bought the Fitzgerald's loan from HTFC, began foreclosure proceedings. Id. After retaining an independent appraisal as a result of these proceedings, the Fitzgerald's learned that the true value of their home was $545,000, a far cry from the $805,000 price

they paid.  Id.  Years of ancillary civil litigation have also been a predictable consequence of the fraud, and losses associated with such proceedings are still being incurred at present.

In sum, it is difficult to overstate the severity and effect of the fraud the defendant helped effectuate.  These facts alone require a Guidelines sentence be imposed.

B.     Nature and Background of the Defendant

The circumstances of the defendant's upbringing and medical history do not weigh in favor of a non-Guideline sentence.  PSR ¶¶ 79-95; See United States v. Vera Ramos, 296 Fed. Appx. 201, 203 (2d Cir. 2008) (affirming guideline sentence despite defendant's "difficult upbringing" and noting district court's observation that such circumstances are "almost universal" among defendants).

Notably, despite claiming in the presentence interview that he was a "light drinker" - a claim that was corroborated by his wife - the defendant has subsequently stated that he suffers from alcohol dependence and a host of related psychosocial conditions, for which he has voluntarily begun treatment.  See PSR at ¶ 90, Defendant's Sentencing Memorandum (Def. Mem.), Dkt. No. 278, at 3-4).  None of the letters submitted by defendant reference alcoholism or any other mental condition.  Def. Mem., Exhbiits 1-4.  While these issues are tacitly offered as explanations for the defendant's illicit conduct and as mitigation for his potential sentence, they do not warrant a below-guidelines sentence, even if they are genuine.

C.     Specific and General Deterrence

A Guidelines sentence is necessary to deter the defendant and others from committing similar misconduct.  A Guidelines sentence in this case is thus necessary to deter not only the defendant, but similarly-situated individuals from engaging in similar fraudulent behavior in the future.

Generally, there is a massive need for deterrence from mortgage fraud. The mortgage asset research institute's March 2009 report to the mortgage bankers association reports that "fraud incidence is at an all-time high," and "[e]merging fraud trends are further draining lender, law enforcement, and consumer resources in the industry's most challenging times." See risk.lexisnexis.com/mari.  The situation is dire.

Additionally, "[b]ecause economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." United States v. Martin, 455 F.3d 1227, 1240 (11th Cir. 2006) (internal quotation omitted). The defendant, an individual with a law degree, is a perfect example of this "calculating" white collar criminal.  As the Eleventh Circuit has noted, "[d]efendants in white collar crimes often calculate the financial gain and risk of loss, and white collar crime therefore can be affected and reduced with serious punishment." Martin, 455 F.3d at 1227.  Mortgage fraud is highly lucrative and thus "requires heavy sentences to deter." Hauptman, 111 F.3d at 52.  Indeed, the defendant's brazen behavior may be explained,

in part, by the fact that defendant must have perceived the reward as high, and the punishment as low.

IV.    Conclusion

For the foregoing reasons, the government respectfully requests that the Court impose a sentence that is sufficient, but not greater than necessary to achieve the goals of sentencing, see 18 U.SC. § 3553(a)(2), which, in this case, is within the applicable Guidelines range of imprisonment. As per the plea agreement entered into by the parties, the government takes no position on where within the applicable Guidelines range the appropriate sentence should fall.

Respectfully submitted,

ROBERT L. CAPERS
United States Attorney

By:    /s/
       Allen L. Bode
       Artie McConnell
       Assistant U.S. Attorneys
       631-715-7825

cc:    David L. Cohen, Esq. (by ECF)
       Linda Fowler, United States Probation Officer (by E-mail)